Richardson, Oh. J.,
delivered the opinion of the court:
The claimant corporation is a land-grant railroad, aided under the provisions of the Act of May 17, 1856, chapter 31, the fifth section of which is as follows (11 Stat. L., 15):
“ Sec. 5. And be it further enacted, That the United States mail shall be transported over said roads and branch, under the direction of the Post-Office Department, at such price as Congress may by law direct: Provided, That uuttl such price is fixed by law the Postmaster-General shall have power to determine the same.”
The mails of the United States were transmitted over its road from July 1, 1871, to June 30, 1875, under a written contract with sureties, set out in finding ii. From July 1,1875, to June 30, 1876, they were carried under orders of the Postmaster-General fixing the rate of compensation set out in finding iv, without any formal written contract. The company has been fully paid up to the latter date, in accordance with said contract and orders, and there is no controversy in relation thereto.
Siuce June 30, 1876, the mails have been carried as before, but without any formal written contract, and the claimant has been paid in accordance with the statutes in force at the time, and the regulations, orders, and general practices of the Post-Office Department.
Three claims are set up by the company, in addition to the amounts paid, each raising a distinct question of law.
1. In 1876, when the Postmaster-General readjusted the maximum compensation which might be allowed under Revised Statutes, section 4002, he deducted therefrom 10 per cent., as required by the Act of July 12, 1876, chapter 179, section 1 (1 Supp. Rev. Stat., 225), and allowed and paid the claimant accordingly from July 1, 1876, to July, 1878, when he made another deduction of 5 per cent., under the Act of June 17,1878, chapter 259,section 1 (1 Supp. Rev. Stat., 359), and paid according to both deductions to June 30, 1880. (Findings v, vi, vii, viii.) The amount thus deducted from the maximum which the Postmaster-General might have allowed under section 4002 of the Revised Statutes is what is now demanded in this action.
The company claims that on the 1st day of July, 1876, it entered into a contract with the defendants by which the mails were to be carried for the period of four years from that date *168 •-at the maximum compensation authorized by Eevised Statutes, «eetion 4002, which could not be reduced either by the Postmaster-General or by Congress during the term of the contract. If such a contract existed the claimant would be right in its allegation that the compensation could not be reduced, as was Meld in the case of the Chicago and Northwestern Railway Company v. United States (104 U. S. R., 681), where it was decided that [the reduction acts of 1876 and 1878, above mentioned, •“apply only to contracts thereafter made, or sueh as did not require the performance of the service for a specific period,” in the language of the head-note of the case as reported.
'The vital question, then, is whether or not such a time contract was entered into by the parties. There was no written •contract, as in the case of the Chicago and Northwestern Bail-way Company, but the claimaut relies upon an alleged implied •contract which it insists springs out of the following circumstances :
By one of the regulations of the Department it is provided as follows:
“ The United States is divided into four contract sections. .A general letting for one of these sections occurs every year, •and contracts are made at such general lettings for four consecutive years, commencing on the first day of July. (Finding xi).”
The claimant’s road was within the section for which contracts were to end June 30, 1875, until the regulation was altered, when it came within the section for which they were to •end July 30, 1876. (Finding xi.)
The only written contract of the parties was made August 18, 1871, to run from July 1, 1871, to June 30, 1875. It was •drawn with strict formality, contained many provisions, and its ^performance on the part of the company was secured by two ¡sureties. (Finding ii.) When it expired it was never renewed.
From July 1, 1875, to June 30, 1876, the service was performed under orders of the Postmaster-Geoeral, dated October 21,1875, and March 21,1876, the latter of which expressly confined its operation to June 30,1876, “unless otherwise ordered.” ^Findings iii and iv.)
The taking and carrying the mails on and after July 1,1876, •the claimant insists, created an implied contract, at the pre-ex-isting rates, for four years, because the company’s road was *169 within the section for which contracts was made for that period of time.
In this view we do not concur. The regulations as to contract sections are not made for railroads alone, but for the whole mail service, and include the “ star-route ” service, for which written contracts are understood to be uniformly entered into. It is very clear, we think, that they are intended to apply only to written contracts, and are merely suggestions that the Postmaster-General, when it is found necessary or advantageous to enter into such coutracts, will so make them that the whole will expire during one Presidential term, in classes, at regular yearly intervals, so as to be most convenient and least embarrassing to the next succeeding administration. They do not compel the Postmaster-General to make time contracts in all cases, nor prevent him from accepting services to be paid for 'só long as performed, aud which may be terminated at any time by either party, as circumstances may require. Nor are railroads obliged to make time contracts. It is entirely optional on their part, aud finding ii shows that the Postmaster-General has been able to make, comparatively, but a. small number of such coutracts with railroad companies, the proportion being much less than 10 per cent, of the whole railroad service, and he has practically abandoned the effort. The regulations as to contract sections, therefore, have no application to cases where it-is not practicable or convenient to make time contracts in writing. When written time contracts are entered into the contractors are required to furnish sureties, as the claimant did in the written contract set out in finding ii; aud it would be most unreasonable to hold that when, on the expiration of such a contract, the contractor continues for a day or more to perform like service, the implication of the intention of the parties is that h,e may and shall continue it for a like period of time without sureties. (Eastern Railroad Case, 20 C. Cls. R., 42.) It is a much more reasonable view that the intention of the parties is that the service is continued only at the option of either party, until they can agree upon the terms of a written contract.
Thecase of Railway Company v. United States (101 U. S. R., 543) is cited in support of the claimant’s position. We considered that decision in the Eastern Railroad Case (20 C. Cls. R., 42), to which we refer for a full exposition of our understanding of *170 its force and effect. We pointed out that the element of length of time of the contract was not involved therein, and that the Supreme Court held only that a contract existed, in the language of the Chief Justice, “ that payment should be made for what was done.”
The claimant is a land-grant railroad company, and as such is under a perpetual contract with the United States, made by the act of 1856, to transport the mails at such prices as Congress may by law direct, and in the absence of that direction, then such as the Postín as ter-General may determine. When, therefore, on and after July 1,1876, the company carried the mails without any special contract with the Postmaster General, it was bound by the contract of that act, making its compensation subject to the laws of Congress. The company had no option in the matter. It was obliged to carry the mails, and to accept whatever price Congress might determine, aud that price might be established after as well as before service performed.
There was no occasion for making a time contract with this company. It was bound by the act of 1856 to perpetual service in transporting the mails, and when the parties ceased entering into such, contracts it is the proper inference that they intended that the service should be performed under the original contract in the act of 1856.
This seems to have been the understanding of both the Department and the company at the time the. service was performed. By the correspondence set out in finding viii it appears that when the treasurer of the company wrote to the Postmaster-General, May 26,1879, for an explanation as to why the small reduction of $20.52 per quarter was made (which in the reply was explained to be owing to a curtailment of the length of the route), the treasurer stated that he had no knowledge of any reason why such a reduction should be made from the amount, $8,813.78 per annum, or $2,203.44 per quarter, as fixed by the circular of July 23. The circular thus referred to is the one set out in finding vii, wherein the company is notified of the 5 per cent, deduction made under the act of 1878. That reduction is not objected to nor questioned.
Congress having fixed the price of the claimant’s compensation, as it had a right to do, and the same having been paid, no cause of action arises on this branch of the case.
There is some difference between the land-grant railroad *171 companies and other railroad companies as to their obligations in carrying the United States mails which has been mentioned in decided cases and which it may be well to note.
While the land-grant companies are bound to transport the mails at prices fixed by Congress, those roads which are aided with bonds are entitled to fair and reasonable compensation not in excess of the rates paid to private parties for the same kind of service. (Union Pacific Railway Case, 20 C. Cls. R. 70.) But both are obliged to perform the service. Other companies are not bound to perlorm the service at all against their will. When they perform service without express contract, their compensation depends wholly upon implietd contracts to be inferred from and interpreted by the general laws of Congress and the regulations, orders, and practice of the Post-Office Department and other attending circumstances, as in the Eastern Railroad Case, before cited.
2. Another claim is for delivering and receiving the mails to and from all post-offices within 80 rods of the line of the road, for which the company has been paid nothing in addition to the rates fixed for the transportation of the same over the railroad route. Additional compensation is refused by the Post-Office Department for the service, on the ground, as alleged, that it is rightly included in the route for which the rate of compensation was fixed by Congress and the Postmaster-General. In this we think the Department is right.
For a long period of time, extending back to the first establishment of the railroad mail service, it has been the practice to include the delivery of the mails within 80 rods of railway stations as part of the railroad route, and that has been promulgated in all advertisements for proposals, and in the official regulations published by authority, as shown by finding xi. A requirement to that effect was inserted in the claimant’s written contract (see 1 st of the numbered articles at the end thereof, in contract set out in finding ii), and was no doubt in all written contracts.
Such a well-established practice, in our opinion, must have been considered by Congress in fixing the maximum compensation, and by the Postmaster-General in making his orders allowing the full amount of the maximum, and therefore the pay for such service must be held to be included in the general compensation fixed for the routes.
*172 If tliis service was properly included in the railroad route, ■then the claimant, being a land-grant company, was conclusively bound to accept the compensation fixed by Congress and the Postmaster-General. If it was not properly included in the railroad route, then the claimant was not bound to perform it, and as it performed the same without objection or question, it must be held to have done so in conformity with the well-known regulations and practices of the Post-Office Department. Had it objected in season the Postmaster-General might have ■reduced its route compensation so far below the maximum as to cover the cost ot this delivery to offices within 80 rods of ■stations. Having made no such objection, the Postmaster-•General had a right to infer that it acquiesced in the practice ■of the Department, and by such acquiescence it is bound.
For these reasons we have not included in the findings of facts any separate value for this service.
3. There is still another claim for $48.72 which was retained from the compensation fixed by Congress and the Postmaster-General for non-delivery of mails on several occasions upon the •days required by schedule time, although they were subsequently delivered.
The amount in this case is small, but the principle of law involved is understood to be one of great magnitude and importance to the Post-Office Department and to all the railroad ■companies, affecting, as it does, the accounts and settlements •of the whole railroad mail service.
On behalf of the claimant the power of the Postmaster-General to make deduction in such case is denied, on the ground, as •alleged, that his authority to do so under Revised Statutes, •section 3962, has been repealed.
That section is as follows."
“Sec. £962. The Postmaster-General may make deductions from the pay of contractors, for failures to perform service according to contract, and impose fines upon them for other delinquencies. He may deduct the price of the trip in all cases •where the trip is not performed; and not exceeding three times ■the price if the failure be occasioned by the fault of the contractor or carrier.”
The fifth section of the appropriation Act of March 3, 1879, chapter 259 (1 Supp. Rev. Stat., 453), provided:
“Sec. 5. That the Postmaster-General shall deduct from the (pay of the railroad companies, for every failure to deliver a *173 mail within its schedule time, not less than one-half of the price-of the trip, and where the trip is not performed, not less than the price of one trip, and not exceeding, in either case, the price of three trips;
“Provided, however, That if the failure is caused by a connecting road, then only the connecting road shall be fined.
“ And where such failure is caused by unavoidable casualty,, the Postmaster-General, in his discretion, may remit the fine.
“And he may make deductions and impose fines for other delinquencies.”
By section 33 it was enacted that “all acts or parts of acts inconsistent with the provisions of this act are hereby repealed.”’
Section 5 of the act of 1879 was expressly repealed by the-Act of June 11, 1880, chapter 206 (1 Sapp. Rev. Stat., 549).
It is contended that section 3962 of the Revised Statutes was-virtually repealed as to railroad companies by section 5 of the act of 1879, and so remained notwithstanding the express repeal of the latter act. The following section of the Revised Statutes is relied upon in support of this position:
“ Sec. 12. Whenever an act is repealed which repeals a former act such former act shall not thereby be revived.”
This twelfth section prescribes a rule of construction, as appears by the Act of February 25, 1871, chapter 71 (16 Stat. L.,. 43), wherein its provision was first enacted. It does nothing more, and we are to consider whether, having that section in view, Congress intended, by the acts of 1879 and 1880, to repeal section 3962 of the Revised Statutes as to railroad companies.
In our opinion there is no such inconsistency between the provisions of Revised Statutes, section 3962, and the act of 1879' as to work a repeal of the former, even in part, by the repeal of the latter by the act of 1880, in such a sense that section 12: of the Revised Statutes has any application to the case.
We do not think that in authorizing deductions to be made from the regulation rates for partial non-performance or imperfect performance of the services it was the intention of Congress to apply this rule to all other contractors and let the railroad companies escape it altogether.
It was held by the Supreme Court of Wisconsin in relation to-similar legislation that “when a statute merely exempts a particular class of cases from the provisions of a previously existing general law which continues in force the repeal of the excepting statute operates to bring such cases under the general law.” (Smith v. Hoyt, 14 Wis., 252.)
*174 Section 3962 of the Revised Statutes applies to all mail service, and is permissive, while the act of 1879 applies to railway-mail service alone, and is obligatory upon the Postmaster-General in the particular cases therein mentioned, leaving all other «ases permissive, as before. The Postmaster-General was authorized to do under said section 3962 what he was obliged to do under the act of 1879.
But there is another view of this branch of the case, independent of these statutes, which are only directions by Congress to a public officer and are not binding upon others unless agreed to by insertion in their contracts, as was the case with the claimant’s written contract, clause 6 (finding ii), or by performing service under an order making the same “subject to fines and deductions,” as. in the orders of October 21, 1875, March 21,1876, and October 12,1876, respecting the claimant’s service (findings iv and vi), or by other assent thereto which may be inferred from the conduct of the parties and the course of business between them.
The maximum compensation authorized by statute and the amount allowed thereunder by the Postmas ter-General are for the whole service expected of such railroad companies according to schedule time and other regulations of the Department. For any failure on the part of a railroad company to perform the entire service and to carry the mails in accordance with the standing order and regulations of the Department, the Postmaster-General had the right, and it was his duty, to withhold and deduct from the authorized compensation a reasonable amount as damages for such failure. That was all he did in this case. The two material things which justify the action of the Postmaster-General are not denied. Delay in delivering the mails on certain occasions is admitted in the petition, and the reasonableness of the amount deducted is not in controversy.
The claimant disputes the liability to any deductions whatever for non-delivery of the mails on time, and claims the whole price for perfect service, notwithstanding any of its delinquencies. To this position of the company, as to its rights and liabilities, we cannot accede.
On the whole case, the claimant is not entitled to recover, and the petition must be dismissed.