Campbell, Chief Justice,
delivered the opinion of the court:
These suits were brought.to recover compensation for mail transportation alleged to be due the parties, respectively, and have been heard together. A large number of similar cases were taken upon submission when these were heard. The questions involved are substantially the same as those in Chicago & Alton R. R. Co., 49 C. Cls., 463, and Yazoo & Mississippi Valley R. R. Co., 50 C. Cls., 15. The two latter cases were appealed to the Supreme Court, where they were affirmed by an equally divided court. That ruling is not an authority for the determination of other cases. Hertz v. Woodman, 218 U. S., 205. It does not follow, however, that the decisions of this court must be ignored by the court itself when similar cases are again presented. The court should have some regard for its own decisions, and in class cases where though the plaintiffs can not appeal or where the defendants do not appeal the court adheres to its ruling and refuses to reconsider cases subsequently presented that are governed by the former decisions. These considerations could very well justify the court’s disposition of the instant cases without an opinion. The plaintiffs, however, are entitled to findings of fact because the amounts claimed are sufficient to authorize appeals. It was therefore decided to hear the parties again in argument, and certain typical cases have been prepared with the view to presenting all of the questions that it is supposed can arise in these so-called divisor cases. The plaintiffs’ attorneys have acocrdingly *273 been heard in extended oral argument and they have filed able and extensive briefs. They have probably left nothing unsaid that would tend either to elucidate the questions involved or to show the right of plaintiffs to recover.
As we adhere to the conclusion that the petitions should be dismissed, we ivill deal more at length with the cases than would be done by the mere anouncement of a conclusion of law. There are some differences in the cases, but we think they can all be disposed of in one opinion.
These suits were brought in the years 1911,1912,1913, and 1914, respectively. In some of them objection was made to order 412 hereafter mentioned; in some of them no objection to the order was made. To each of the objections reply was made by the Postmaster General to the effect that no contract would be made which excluded a full observance of the rules and regulations, and at that time order 412 had been promulgated. The respective adjustment notices which later followed had not been issued; all of the plaintiffs received and transported the mails and were paid therefor periodically according to the terms of order 412 and the readjustment notices issued by the Postmaster General and without objection or protest when payments were accepted.
The objections or exceptions to order 412 were general. There was no separate objection based upon a supposed injustice to 6-day routes. The contracts were with the different plaintiffs who operated both classes of routes and contracted for both alike.
The claims may be classified as being (1) claims of what are called 6-day routes, (2) claims of 7-day routes, (3) claims of a railroad on parts of whose line are routes affected by the land-grant act.
An illustration of the claims asserted by some 7-day routes under a supposed implied contract may be taken from a typical route as follows: The mails were actually weighed on the route for 105 days, which included 15 Sundays. The total of the 105 weighings (making the dividend) was divided by 105, and the daily average weight was found to be 143,314 pounds. The maximum statutory rates were applied, and *274 the annual compensation was ascertained to be $305,253.67. This sum was paid in monthly installments, which, as they severally matured, were received by the carrier without objection of any kind.
If instead of using 105 as the divisor 90 had been used, the daily average weight would have been 167,199 instead of 143,314 as actually found.
Assuming that the actual average weight found by 105 as the divisor fairly represented the actual weight carried each day throughout the year, it would appear that on said route there was actually transported during the year of 365 days something over 52,000,000 pounds of mail, whereas if 90 had been used as the divisor the carrier would have been credited with transporting during the year about 61,000,000 pounds, making a difference between what was thus actually carried and what by the use of the divisor 90 would appear to have been carried of about 9,000,000 pounds of mail. If the basis adopted was 313 days per year the difference in the weights under like computations would be approximately seven and a half million pounds. The difference between what the carrier was paid and what it would have received if its compensation had been based upon the result of using 90 as the divisor and the maximum rate would have been about $46,000 per year. This amount for each of the years in suit is claimed. The actual weight of the mails carried during the year is not shown, except by taking the actual average weight per day found as above and multiplying it by 313 or 365 days. The actual weight can not be approximated otherwise.
The action is based upon contract, and plaintiff, denying there was an express contract, relies upon implied contract for recovery as upon quantum, meruit. It has been paid the maximum rates provided by law for the average weight of mails actually carried. Can it recover under an implied contract as upon quantum, meruit for the 9,000,000 pounds of mail which it did not in fact carry and thereby receive $46,000 per year additional to what it has received ?
A contention advanced, however, by plaintiffs is that the law required the use of a “ divisor of 90.”
*275 Two propositions may be regarded as settled:
(1) That the railroad companies were until the act of July, 1916, free to accept or refuse the terms proposed by the Postmaster General for the transportation of mails. Thus it was held in Alabama Great Southern Railroad case, 25 C. Cls., 30, 41, decided in 1889, in an opinion by Judge Nott, that railroads other than land-grant roads “ are under no obligation to the Government to carry the mail and may decline the service if they will, but that if they do perform, it must be upon the terms and conditions prescribed by the statutes and regulations of the Post Office Department or under an express contract within the 'limitations imposed by law.” This case was affirmed by the Supreme Court, 142 U. S., 615.
In Eastern Railroad Company, 129 U. S., 391, 395, it is said:
“ After the first of July, 1877, the company was under no legal obligation to carry the mails. * * * We do not mean that the railroad company was bound to continue the carrying of the mails, if subsequent changes in the rates were unreasonable or did not meet with its assent. On the contrary, it was at liberty, when the five per cent reduction was made, to discontinue their transportation on its cars.”
In Chicago, Milwaukee & St. Paul Railway Company, 198 U. S., 385, 389, it is said:
“A contract may not be forced upon a railway. It may accept, however, and become bound by the action of the Post Office Department.”
To the same effect is Minneapolis & St. Louis Railway Company, 24 C. Cls., 350, and Texas & Pacific Railway Company, 28 C. Cls., 379.
In L. & N. Railroad Company, 46 C. Cls., 267, 277, it was declared that the Post Office Department had no authority to compel the company to transport the mail upon terms to which it had not agreed. Delaware, L. & W. Case, 51 C. Cls., 426.
(2) The rates stated in the statutes were maximum rates.
After the amendatory acts of 1876 and 1878 herein mentioned were passed a suit was brought in this court involving the construction of said acts, and in the opinion de *276 livered by Judge Eichardson (Eastern Railroad Company Case, 20 C. Cls., 23, 41) it was said:
“Section 4002 of the Eevised Statutes, from the act of 1873, does not establish an absolute rate of compensation, necessarily alike to all railroads, for mail transportation, but fixes máximums which are not to be exceeded, leaving the Postmaster General a discretion to make contracts at less rates if he should be able to do so. On that point the language of the section is clear — ‘ the pay per mile shall not exceed the following rates.’. It is urged that this language is controlled by the preceding words of the section, ‘ The Postmaster General is authorized and directed to readjust the compensation hereafter to be paid for the transportation of mails on railroad routes upon the conditions and at the rates hereinafter mentioned.'1 In our opinion the rates there referred to are any rates which the Postmaster General may contract for, not exceeding those thereinafter mentioned.”
This case was decided January 12, 1885, and upon appeal was affirmed by the Supreme Court February 4, 1889, 129 U. S., 391, 395. In the Supreme Court’s opinion, delivered by Mr. Justice Harlan, it is said:
“After the first of July, 1877, the company was under no legal obligation to carry the mails. It carried them after that date under an implied contract that it should receive such compensation as was reasonable, not exceeding the maximum rates prescribed by Congress, and subject to a readjustment of rates as required by the act of 1876.”
Again, in 1889, this court, speaking through Chief Justice Richardson, in Minn. & St. L. Ry. Co. Case, 24 C. Cls., 350, said, p. 361:
“ In the Eastern Railroad case (20 C. Cls., R. 41), affirmed on appeal (129 U. S., 391), we held that the statute (Eev. Stat., § 4002) did not fix the exact amount to be allowed to railroads, but only the maximum which the Postmaster General could not exceed, leaving to him a discretion to make contracts in his own way at less rates if he should be able to do so.”
And again, in 1893, in the Texas & Pac. Ry. Co. case, 28 C. Cls., 379, it was said, p. 389:
“ It seems to be assumed by the claimant that the statutes fix an absolute rate of compensation, while in point of fact *277 they fix only tbe maximum below which the Postmaster General is authorized to make such contracts as he deems the needs of the mail service may justify.”
In A. G. S. R. R. Co. case, 25 C. Cls., 30, 43, decided in 1889, this court, speaking through Judge Nott, and with reference to the portions of a railroad that were land-aided, said:
“ But as to these latter portions of the road it was unquestionably within the power of Congress to set a limitation upon the price which should be paid for such service, and thereby to leave the public agent, the Postmaster General, without authority to bind the defendants for any greater price, either by entering into an express contract or by accepting the claimant’s services without one; and it was equally within the discretion of Congress to fix different rates for different roads or classes of roads, and in so doing to say that if part of a mail carrier’s line was a land-grant road the remainder of the line should be restricted to the same compensation. Such a restriction would not bind the carrier to carry the mail, but it would bind the Postmaster General not to incur a greater liability, and would be notice to the road at what point his authority to bind the Government by contract terminated.”
In Jacksonville, Pensacola & Mobile R. R. Co. case, 21 C. Cls., 155, decided in 1886, and affirmed by the Supreme Court (118 U. S., 626), it is recognized that the rates mentioned in the statute are maximum rates.
In A. G. S. R. R. Co. case, 25 C. Cls., 30, 43, decided in construed a provision of the act of March 2, 1907, 34 Stats., 1212, which provides additional pay for railway post-office cars “ at a rate not exceeding ” designated sums for different lengths of cars. That act was an amendment of section 4004, Revised Statutes, in that it changed the maximum rate stated and made some change with reference to the sizes of the cars mentioned in the earlier act. The terms “ at a rate not exceeding ” are the same in both acts, and section 4004 is in the same language as the second proviso in the act of 1873. The Supreme Court held “The statute defined a car line, but did not fix the compensation. It left that to be determined by the Postmaster General, who could have named any rate not to exceed the statutory maximum.” If the language *278 of said proviso to tbe act of 1873 only fixed a maximum rate, it is difficult to see bow tbe language in tbe same statute tbat tbe pay per mile per annum “ shall not exceed tbe following rates ” is to be given a different meaning.
Tbat tbe rates were “ specified maximum rates ” was recognized by tbe Supreme Court as early as 1881 in Chicago & N. W. Ry. Co., 104 U. S., 680, 683. Tbat they were maximum rates is declared by Devised Statutes, section 3999, providing for tbe contingency that the Postmaster General may not be able to contract within tbe prescribed maximum rates.
We think it is too late to question the rule stated.
First: It is said in one of the briefs for plaintiffs, speaking of the act of March 3,1873,17 Stats., 558, tbat it “ plays the most important part in this case.” But tbat act is not to be considered independently of tbe balance of tbe law when we come to construe its meaning.
The act of June 8, 1872, 17 Stats., 283, entitled “An Act to revise, consolidate, and amend tbe Statutes relating to the Post Office Department,” deals comprehensively, as its title imports, with tbe powers, duties, and responsibilities of that department. It was referred to in tbe opinion of this court in the Chicago & Alton case and we now mention some of its provisions with more particularity. It contains more than 300 sections and embodies the statutory law relating to tbe Post Office Department, with perhaps a minor exception not material here. By its repealing clause (sec. 327) it repeals “tbe following acts and parts of acts and resolutions and parts of resolutions,” and there follows a list of tbe acts and resolutions wholly or partly repealed, beginning with section 2 of tbe act of March 3, 1791, and concluding with tbe act of April 27, 1872. Included in the repealed statutes are tbe act of July 2, 1836, 5 Stat., 800, tbe two acts of March 3, 1845, 5 Stats., 732, 748, and section 8 of the act of March 3, 1845, 5 Stats., 752. It provides for the establishment of “ a department to be known as the Post Office Department,” the principal officers of which “ shall be one Postmaster General and three Assistant Postmasters General,” to be appointed by the President, by and with the consent of the Senate. The term of office of the Postmaster *279 General is “ for and during the term of the President by whom he is appointed, and for one month thereafter, unless sooner removed.”
After prescribing in particular some of the duties of the Postmaster General, the act of 1872 provides (sec. 6) that he shall generally superintend the business of the department and execute all laws relating to the postal service.
By section 388 of the Revised Statutes of 1878 it is provided “ That there shall be at the seat of government an executive department to be known as the Post Office Department, and a Postmaster General, who shall be the head thereof.”
Among other provisions of the act of 1872 the following appear:
Section 46: “ That the money required for the postal service in each year shall be appropriated by law out of the revenues of the service.”
Section 210: “ That the Postmaster General shall arrange the railway routes on which the mail is carried * * * into three classes, according to the size of the mails, the speed at which they are carried, and the frequency and im7 portance of the service, so that each railway company shall receive, as far as practicable, a proportionate and just rate of compensation, according to the service performed.” This differs from its predecessor, the act of 1845, in the order of terms and in the introduction of the word “ frequency,” which did not appear in the act of 1845.
Section 211 provides the maximum pay for the several classes of routes “ per mile per annum.”
Section 212: “That if the Postmaster General is unable to contract for carrying the mail on any railway route at a compensation not exceeding the maximum rates herein provided, or for what he may deem a reasonable and fair compensation,” he may make other arrangements for carrying the mails.
Section 213: “ That every railway company carrying the mail shall carry on any train which may run over its road, and without extra charge therefor, all mailable matter di *280 rected to be carried thereon, with the person in charge of the same.”
Section 214 provides that all railway companies which have been aided by a grant of land or otherwise “ shall carry the mail at such prices as Congress may by law provide; and, until such price is fixed by law, the Postmaster General may fix the rate of compensation.”
Section 256: “ That no contract for carrying the mail shall be made for a longer term than four years, and no contract for carrying the mail on the sea shall be made for a longer term than two years.”
Section 265 authorizes the Postmaster General to enter into contracts for carrying the mails with railway companies without advertising for bids therefor, and further authorizes him to allow any railway company “ with whom he may contract for the carrying of the United States mail, and who ■furnish railway post-office cars for the transportation of the mail, such additional compensation beyond that now allowed by law as he may think fit, not exceeding, however, fifty per centum of the said rates.”
Section 200: “ That all the waters of the United States shall be post roads during the time the mail is carried thereon.”
Section 201 provides “ That all railways and parts of railways which are now or hereafter may be put in operation are hereby declared to be post roads ”; and by sections 202 and 203 canals and plank roads during the time the mail is carried thereon are declared to be post roads.
All of these sections were carried into the revision of 1873 and constitute sections 3997 et seq. and section 3964 and sections 3942 and 3956 -of the Eevised Statutes, the latter authorizing contracts with railway companies without advertising for bids and declaring that no contract for carrying the mails shall be made for a longer term than four years.
Provision is made (sec. 212, act of 1872; sec. 3999, liev. Stats.) for the contingency that the Postmaster General may be unable to contract for the carrying of the mail on any railway route at a compensation “ not exceeding the *281 maximum rates herein provided, or for what he may deem a reasonable and fair compensation,” and he is authorized to contract with others for the service upon the happening of such a contingency. It is manifest that this section, being an authority to a public officer to contract with the railway companies within the maximum rates fixed by the act, “ or for what he may deem a fair and reasonable compensation,” was something more than a mere authority conferred on him, because the words just quoted are sufficient, when addressed to a public officer, to impose upon him the duty of exercising his judgment as to the reasonableness and fairness of the compensation, which he proposes to pay.
It is not necessary when inquiring into the powers and functions of the Postmaster General under such an act as that of 1872 or the revision of 1878 to find expression in explicit terms of all his rights and powers and duties. An applicable rule in such case, stated in one of the plaintiff’s briefs and in the Government’s brief as well, is as follows:
“A practical knowledge of the action of any one of the great departments of the Government, must convince every person that the head of a department, in the distribution of its duties and responsibilities, is often compelled to exercise his discretion. He is limited in the exercise of his powers by the law; but it does not follow that he must show a statutory provision for everything he does. No government could be administered on such principles. To attempt to regulate, by law, the minute movements of every part of the complicated machinery of government would evince a most unpardonable ignorance on the subject. Whilst the great outlines of its movements may be marked out, and limitations imposed on the exercise of its powers, there are numberless things which must be done, that can neither be anticipated nor defined and which are essential to the proper action of the Government. Hence, of necessity, usages have been established in every department of the Government which have become a kind of common law, and regulate the rights and duties of those who act within their respective limits. And no change of such usages can have a retrospective effect, but must be limited to the future.” United States v. Macdaniel, 7 Pet., 1, 14.
Aside from that rule it is plainly deducible from the terms of the statute that there was devolved upon the Postmaster General the duty of contracting with railway companies on *282 terms within maximum rates and. that it required of him the exercise of a broad discretion in matters pertaining to the transportation of the mails. In theory at least the expenses of handling the mails by the department were to be borne by its revenues. Rev. Stat., sec. 4054. These were to be covered into the Treasury and the expenses were appropriated for by Congress out of such revenues. From the earliest period the carrying of the mails was under contract, and the act of 1872 made no change in that regard except in the case of land-aided roads. Their duty to transport the mails arose from the statutes granting them aid.
When therefore we come to consider the meaning of the act of March 3, 1873, we must treat it not as a separate and distinct piece of legislation but in connection with the law then upon the statute book, of which, when enacted, it became only a part. By its enactment some material changes in the existing law were made, and those are to be ascertained from a proper consideration of the entire law. Repeals by implication are never favored. Where there is inconsistency between the provisions of the new law and those of the old effect should be given to both if it reasonably may be, and unless there be a positive repugnancy the old law is only repealed by implication fro tanto to the extent of the repugnancy. Wood's case, 16 Pet., 342, 363; Tynen's case, 11 Wall., 88, 93.
Some significance attaches to the fact that the Congress enacted in the revision of 1873 so many of the provisions of the act of 1872 and incorporated therein at the same time the act of 1873, and to the further fact that those provisions have continued as part of the law. The act of July 28, 1916, 39 Stats., 425, marked a distinct departure from prior law.
As already stated, the revision of 1873 made the Postmaster General “the head of an executive department,” thereby enlarging the first section of the act of 1872. It also by section 4003 made an important change in the proviso from which that section is taken in the act of 1873. The latter act provided that “ in case any railway company now furnishing railway post-office cars shall refuse to provide such cars such company shall not be entitled to any increase *283 of compensation under any provision of this act” while section 4003 forbids any increase of compensation under the provisions of “ the next section,” which provides an increase for the use of the cars. These provisions are in the law because of the adoption of the revision of 1873.
The authority and duty of the Postmaster General to make contracts with railway companies, the provision that no contract for carrying the mails “ shall be made for a longer term than four years,” the right of the Postmaster General to discontinue service on any postal route, the classification of railway routes and the maximum pay therefor, the duty of the Postmaster General to make contracts with others where he can not contract within the maximum rates provided by the statute or “ for what he may deem a reasonable and fair compensation,” and other provisions of the act of 1872, have been continued as a part of the statutory law along with the act of 1873.
The act of 1845 had directed that the Postmaster General arrange and divide the railroad routes into three classes according to the size of the mails, the speed with which they were to be conveyed, and the importance of the service, while section 210 of the act of 1872 (sec. 3997 Eev. Stats.) provided for arranging the railway routes into three classes according to the size of the mails, the speed at which they are carried, and the “ frequency and importance of the service,” so that all railway companies shall receive, as far as practicable, a proportionate and just rate of compensation, according to the service performed. The “ equal and just ” rate of compensation mentioned in the act of 1845 gives way to just and proportionate rate in the act of 1872.
The act of 1873 appropriates for an increase of compensation, and provides that the Postmaster General readjust the compensation to be paid for the transportation of the mails on railroad routes “upon the conditions and at the rates hereinafter mentioned,” said conditions being, first, that the mails shall be carried with due frequency and speed and that a suitable car be provided, and, second, “that the pay per mile per annum shall not exceed the following rates.” (Sec. 4002, Eev. Stats.)
*284 Due'frequency and speed and the furnishing of certain cars were conditions, and what should be due frequency and speed, and what the character of the cars, were left largely in the first instance to the determination of the Postmaster General, but being “ conditions ” it is clearly implied that the matter should be consummated by an agreement of the parties.
Whether in putting in operation the act of 1873 the Postmaster General could have continued to classify the routes into three classes as provided by section 3997 of the Revised Statues we need not stop to inquire. The authority to do so having been continued, it can not be positively affirmed that the act of 1873 prevents it. It certainly can not be affirmed that the act of 1873 is inconsistent with all of the provisions of section 210 of the act of 1872 (sec. 3997, Rev. Stats.), which, as stated, still stands upon the statute book as declaring the purpose that some distinctions be made “ so that each railway company shall receive, as far as practicable, a proportionate and just rate of compensation, according to the service performed.” The observance of that purpose necessarily involved the exercise of judgment and discretion by the Postmaster General. Nor is there any doubt that the Postmaster General when he first came to apply the act of 1873 made a distinction between at least two general classes of railroad routes, namely, those carrying mails six and seven days, respectively, having regard to the speed and frequency with which they were carrying the mails as well as to the character of the service performed. The law vested in him full discretion to do that, and the right and duty to exercise that discretion necessarily continued in the office of the Postmaster General. The discretion being vested by statute its exercise by one or more officials could not prevent its exercise by a succeeding one. Macdaniel's case, 7 Pet. 1, 14.
Nor did the act of 1873 repeal section 212 of the act of 1872 (sec. 3999, Rev. Stats.), which imposed a duty on the Postmaster General to contract for the transportation of the mails for a compensation within the maximum rates allowed by law or for less than the maximum rates if his judgment *285 dictated that a reasonable and fair, compensation would be less than the maximum. The act of 1872 had provided certain maximum rates to be paid “ per mile per annum ” and the act of 1873 declared that the “ pay per mile per annum shall not exceed the following rates.”
We are told that some years prior to 1873 the question of classification of the railroad routes with reference to “the size of the mails ” and the other provisions of the law had been a matter of difficult application and that the Postmaster General had originated a plan by which he called upon the railroad companies to furnish statements of the weights of the mails being carried, and to that end they were asked to weigh the mails for 30 consecutive working days. This they did in many instances, but at times they failed to do so. They weighed the mails being carried on 6-day routes for the 30 days during which they were carried, and they weighed the mails on the 7-day routes during a period of 35 days. In both instances they reported as the average the totals divided, by 30. These returns were made the basis of adjustments by the Postmaster General where differences arose in the matter of settlements.
The importance of a change whereby the indefinite term “size” of the mails and other features requiring his judgment would be put in more definite form was called by the Postmaster General to the attention of Congress. We are told that the act of 1873 originated in his office and was intended to effectuate the plan he had conceived for making weight rather than size the basis of compensation. If it was intended to give concrete expression to a requirement that the mails should be weighed in the cases of the two classes of roads for 30 and 35 days, respectively, and the dividend in both cases be divided by 30, the language of the act falls short of making it so. It calls for an average and indicated the number of weighings, and hence literally the divisor is the number of weighings and the dividend is their sum. It limited the number of weighings to not less than 30 and left for the determinatoin of the Postmaster General the number of successive workings days on which the mails were to be weighed. It required weighings at least once in four years *286 and left it for the Postmaster General to determine whether they should be conducted oftener. The times when they should be made and their frequency were not fixed by the act. If the act was a departure from the classification contemplated in the prior law, it did not prescribe in terms what differences should be made between routes performing different service. It was known to Congress that some routes were carrying the mails for 7 days a week, some for 6 days a week, and others for a less time. The relative proportion of 7-day routes to 6-day routes was about one to seven.
While making frequency and speed conditions upon which contracts would be made, the act did not in terms withdraw the injunction in section 210 of the act of 1872 (3997, Rev. Stats.) that contained the legislative expression of the reason and purpose of classifying the railway routes, and its proper observance rested in the discretion of the Postmaster General.
While section 210 of the act of 1872 provided maximum rates for three classes, the act of 1873 provided a graduated scale of maximum rates based upon average weight. It left, however, the adjustment of rates to intermediate weights in the hands of the Postmaster General.
Many features in the act of 1873 rest for their practical operation in the judgment and discretion of the Postmaster General. Seme of these are stated in the Chicago & Alton case, p. 507, and others are found in other parts of the law.
When the Postmaster General came to apply the law he found that the mails were being transported by different railroads for different numbers of days per week, some for 7 days, others for 6, and yet others for fewer days. The indicated purpose of the law relating to classification was that the different roads should receive, as far as practicable, a just and proportionate compensation, according to the service performed, and due frequency and speed were conditions entering into the contemplated readjustments. The rates mentioned were limited to designated standards, and the intermediate weights falling between these standards could only be compensated for upon schedules left to the Postmaster General to adjust.
*287 As to those intermediate weights he had discretion, because he could prescribe greater or less rates within the stated standards by making the proportion greater for the smaller intermediate weights than for the larger ones, or he could do the reverse.
The term “weight” had superseded the term “size” in the prior law, but actual weight could not be had without constant weighings, which were impracticable. The average weight carried became therefore the basis upon which the Postmaster General could contract if the railroad companies would agree. An actual average of 30 different weighings would not in the very nature of things show the actual weight transported because it changed (generally increasing) during the year, and the disparity became greater in proportion to the length of the contract term. The weighings were not confined to a given number of days but were to be for not less than a stated number.
The policy of Congress, as indicated by its general legislation on the subject, had been to leave the handling of the business in the Postmaster General’s hands under such limitations as they saw fit to prescribe. His duties and his authority (sec. 6, act of 1872) were in a general way defined, among them being that he should “generally superintend the business of the department.” In the revision of 1873 the department appears as one of the executive departments, and the Postmaster General is made the head of it. That the affairs of the Post Office Department bear more analogy to a large business enterprise than to a function of Government is apparent. That in the conduct of it much is and must be necessarily left to the judgment and discretion of its superintendent is also apparent. When, therefore, he found that the act of 1873 provided for an average weight of mail, according to which compensation was to be readjusted and under which contracts for their transportation should be made, was the law under which he was to act-mandatory or directory merely? By directory provision it is meant that they are to be considered as giving directions which ought to be followed, but not as so limiting the power in respect to which the directions are given that it can not *288 effectually be exercised without observing them. Hubbert v. Lumber Co., 191 U. S., 70, 76; De Visser case, 10 Fed., 642, 648.
Whether an act is directory depends upon the sound construction of its nature and object and of public convenience and apparent legislative intention. If it be merely directory, a deviation from it may subject the official to responsibility to the Government, but can not be taken advantage of by third parties. Bank v. Dandridge, 12 Wheat., 64, 81.
In Martin's case, 94 U. S., 400, the court held that the eight-hour law of 1868 was a mere direction by the Government to its agent, and did not affect the right of contract. This court has said in effect in an opinion by Judge Barney that the act was merely directory. New York, N. H. & H. case ante, p. 222. When the daily average was found by either method it was not controlling upon the roads because they could refuse to contract or transport the mails at all. If the act was mandatory a mathematical average would result and the proposed terms could be adjusted within the maximum rate provided the carriers agreed. If the law was directory or permissive a method to be found by the Postmaster General could be adjusted to actual conditions. If he assumed that the rates were fixed or could be enlarged, he was plainly in error, because the courts have held otherwise. If the act was mandatory it marked a departure from the policy of Congress as regards the conduct of this great business enterprise. It had directed a classification to be made so that “ as far as practicable ” j ust and proportionate compensation could be made, according to the service performed.
That the act was directory seems to have been the view adopted by the Postmasters General in the early stages of its application, because the defense of the usage in 1885 was based upon the justice of the practice then in vogue and not upon the absolute requirements of the law. Nor could they plainly read into the language of the act of 1873 a requirement that the mails be weighed 35 days and divided by 30. Speaking as it did of a number of weighings, not less than 30, and using the word “ average,” a literal application of the terms would call for a dividend made up of the sum of *289 tbe terms in the divisor, and therefore for an actual average ; but treating it as directory ivould authorize what may be called a permisive average deemed just to the Government and the railroads.
It was materially supplemented in that regard by the act of 1875. By treating it as directory the long-continued usage of the department and the recognition thereof in the repeated appropriations by Congress can be supported. Being directory, it was left to the judgment of the Postmaster General, under such instructions as he considered just to both parties, to ascertain the daily average weight by some other than a mathematical rule. The power was not to be arbitrarily or capriciously exercised, and ample protection against that kind of action could be found in the right of the railroad companies to decline to accept the average as found by refusing to transport the mails or in the course suggested in Jacksonville R. R., 118 U. S., 626, 628. And see Martin's case, 94 U. S., 400. It is clear that if the law permitted him to adopt a course of action which to him seemed just the original adoption of it or the continuance of the usage could not take away or limit the right, duty, or powers, of his successors to act independently when in their wise discretion changed conditions seemed to warrant a change in the usage. Charged with the same or similar duties and responsibilities, his successors were vested with the same powers he had. Usage alone would not make it mandatory, and, except that a change in the usage would not be allowed to affect the rights acquired under a previous usage, its alteration can not be prevented by parties whose claims arise after full notice of the v change. Macdaniel's case, 7 Pet., 1; Alabama Great Southern R. R. case, 142 U. S., 615.
When the Postmaster General came to apply the law he called upon the railroad companies, who were then conducting the weighings, to report the weights to him in accordance with the plan he had originated. The practice followed was to weigh the mail on 6-day routes for 80 days and on 7-day routes for 35 days. The Sunday weights on the 7-day routes were reported as part of the Monday weigh- *290 ings. The totals in both cases were divided by 30 and the quotients were accepted as the average daily weight. This daily average weight on the 6-day routes was thus an actual average, and that on the 7-day routes may be called a permissive average. Very generally the maximum rates prescribed by the statute and by the schedule of rates applicable to intermediate rates as formulated by the Postmaster General were applied to the daily average thus ascertained. If the law required an actual average in all cases it is plain that by the method adopted the 7-day routes were credited with more average weight of mail than they carried, and were therefore paid more than an actual average of their weights would have justified within the maximum rates prescribed by law, a course that can be justified only upon the assumption that the average to be ascertained under the law was not an actual average, but such an average as having regard to the other provisions of the law, the Postmaster General might adopt. That Congress was informed of the method adopted, and by repeated appropriations to meet deficiencies and appropriations based upon these estimates, which in turn were based upon said method, may well be taken as admitting that the Postmaster General’s action was satisfactory to them. They appear to have been equally satisfied with the - results of Order 412. They did not change it.
Within less than two years after the act of 1873 went into effect, the act of March 3, 1875, 18 Stats., 341, was passed. ¿That act, we may assume, also originated in the Post Office Department. It provided for a change in the conduct of the weighings and required them to be made by employees of the department. It carries a provision which we think is of importance in this connection. The prior act had required that the result of the weighings by railroads “ be stated and verified in such form and manner as the Postmaster General may direct,” while the later act directed that the Postmaster General “have the weights stated and verified to him by said employees under such instructions as he may consider just to the Post Office Defartment and the railroad com- *291 pañíes” [Italics ours.] We do not think that the full force of this expression is found in the suggestion that it merely authorized him to devise some just plan “ for obtaining the gross weights,” because it is to be assumed that he would have done that anyway. The studied phraseology of the act indicates a broader purpose. It mentions “ such instructions as he may consider just to the Post Office Department and the railroad companies ” with reference to having the weights stated and verified to him. The Postmaster General by the plan adopted had credited the 7-day routes with possibly one-sixth more than the actual average weight being transported. That he supposed he had the authority may be assumed from the fact that he so exercised it. And it is conceivable, at least, that he would desire a more concrete expression of legislative authority to continue the practice. Chicago & Alton case, p. 516. The act of 1875 may be accepted as authorizing instructions such as were given, whereby the Sunday weights were reported with the Monday weighings. The authority to give such instruction as he might consider just necessarily involved the exercise of judgment and discretion. We see no reason why in the terms of the act of 1875 may not be found an escape from the literalism of the act of 1873, if it is not found in other provisions of the law, because we find that as late as 1884 the Postmaster General, in submitting the question to the Attorney General and stating the method of ascertaining the average weights, said: “ The weight on the Sundays being treated as if carried on Mondays.” Such, then, were his instructions, because he considered that bourse just to the Government and the railroads. But that is not to say that the method pursued was mandatory upon the Postmaster General. The fact that he could give instructions involved the right to determine what the instructions should be, and what would be “just” was for his determination. The determination of it at one time, or by one or more Postmasters General, did not affect the right of others to give other instructions and to find that another course was just. The weighings every four years or oftener required, as they occurred, an observance by the then Postmaster General of the injunctions of the law.
*292 The acts of 1876 and 1878 directed a reduction in the rates, and they were accordingly applied. It was under these acts that the cases arose wherein this court determined that the rates mentioned were maximum rates. They did not affect or establish the divisor.
No further legislation occurred affecting the questions until the act of 1905, which provided that the mails should be weighed for not less than 90 successive working days. Except for the change from 30 to 90 the act of 1905 uses the language of the act of 1873. If literalism be indulged, the language would seem to indicate a change rather than a confirmation of an existing method, but we think the correct view is that Congress still left the discretion of the Postmaster General unimpaired. That law did not make permanent or obligatory any divisor.
The next act was that of March 2, 1907, which changed the rates with reference to roads carrying upward of 5,000 pounds of average weight of mails per day. That act did not affect the method of ascertaining the average. Its requirements are met when, to the average ascertained according to a directory statute, the proper rates were applied, the railroads having still the right to refuse to contract at all.
On June 7, 1907, the Postmaster General issued Order 412, which provides “That when the weight of mails is taken on railroad routes the whole number of days included in the weighing period shall be used as a divisor for obtaining the average weight per day.” No attempt to apply this rule to existing contracts was made. The rule was intended to be and was applied prospectively in the several contract sections as the quadrennial weighings occurred. We do not find that this rule is subject to the objections which the plaintiffs have urged against it.
Turning now to the contentions of the plaintiffs:
(a) That the railroads were by statute declared to be post roads. No significance attaches to that fact in these cases.
The same statutes declare that canals and plank roads shall be post roads. It has been correctly stated that the *293 establishment by law of all railroads as post roads means nothing more than that the mails could and might be carried over such railroads as over the ordinary public highways, and the mere fact of making such declaration did not, eren by implication, indicate that the United States could or would undertake, without the consent of the railroad companies and without making compensation therefor, require any railroad company to transport the. mails over its lines. Atlantic & Pacific Telegraph Co., 2 Fed. Cases, 632; State of Pennsylvania v. Wheeling, 18 How., 421, 441. Post roads and post routes are not synonymous terms. Blackham v. Gresham, 16 Fed. Rep., 609, 611; Congress declares what are post roads, and it requires action by the Postmaster General to authorize railway postal routes.
(b) That what is called the long-continued departmental construction of the act of 1873 is controlling.
It was stated in the Chicago & Alton case, p. 492, that in the construction of a doubtful and ambiguous law the contemporaneous construction of those who were called upon to act under the law and were appointed to carry its provisions into effect is entitled to great respect, and ought not to be overruled without cogent reasons and may be accepted as determining its meaning. By accepting the view above stated, that the law was directory, and not mandatory with' reference to the ascertainment of the average weights, we can find support for the departmental usage that was so long continued. If, on the other hand, the act was mandatory and literal it was not pursued correctly. “ It will not be contended that one Secretary has not the same power as another to give a construction to an act which relates to the business of the department. And no case could better illustrate the propriety and justice of this rule than the one now under consideration.” Macdaniel's case, 7 Pet., 1, 14. Such is the rule where the change is made prospective and is not given a retroactive operation. The claims asserted here arose after the Postmaster General had changed the order, and they are in no sense rights vested or accruing under a former construction or usage of the department. The distinction is illustrated by Macdaniel’s case, where an *294 employee of the Navy Department was held entitled to certain compensation, because he had rendered services under a construction which obtained during the time of the service. He was not claiming under the changed construction, but his rights arose during what may be called the erroneous construction. The distinction is also noted in Alabama Great Southern Railroad Co. case, 142 U. S., 615, 620, where the general rule contended for by plaintiffs is stated, and it is said that the courts will look with disfavor upon any sudden change whereby parties “ who have contracted with the Government upon the faith of such construction may be prejudiced ”; and it stated further: “ It is especially objectionable that a construction of a statute favorable to the individual citizen should be changed in such manner as to become retroactive, and to require from him the payment of moneys to which he had supposed himself entitled, and upon the expectation of which he had made his contracts with the Government.” The construction or usage “ must be considered binding on past transactions.” Macdaniel's case, supra, page 15.
In Midwest Oil Co. case, 236 U. S., 459, the Supreme Court, three justices dissenting, held that the long-continued practice by the Chief Executive of withdrawing public lands sustained the right to do it in the particular case, though there had been no statute authorizing it. Deferring to the cases of continued practical construction it was said, page 473: “ These decisions do not, of course, mean that private rights could be created by an officer withdrawing for a railroad more than had been authorized by Congress in the land-grant act.” “ Nor do these decisions mean that the Executive can by his course of action create a power.” The court held that a long-continued exercise of the authority was sufficient to sustain action after it had been taken as against parties whose rights arose thereafter, but it was not held that the rule was mandatory and could not be departed from. Nor indeed can it be stated that the rule is so general as to be applicable in all cases involving departmental action because a principle inhering in our system is that it is a government of laws. It would be a strange conclusion to reach that de *295 partmental usages founded on its own construction of the statute can not be changed by the same authority which gave them birth. The Congress may enact a law which they can amend or repeal; the courts may construe a statute and modify or overrule their decisions. Is the executive branch alone so hampered that it may not modify or change the construction or the usage or practice or methods it may have adopted when such modification or change is given a prospective and not a retroactive operation and when the claims asserted did not arise until after the usage is changed, and particularly when the usage originated in the exercise of a directory authority?
(c) It is, however, further contended by plaintiffs that their view does not rest solely upon departmental construction, but that it is also sustained by the effect to be given to the passage of the act of 1905 as well as the acts of 1876 and 1878. Particular stress is laid upon the acts of 1905 and of 1907.
Exception is taken in one of the briefs to the statement in the Chicago & Alton case, p. 512, that “ it is evident that Congress was not satisfied with the average weights being obtained, whether the dissatisfaction arose from the method or the result, and they therefore changed the law to insure a more satisfactory average.” It can not be denied that under the terms of the act of 1873 the Postmaster General could have weighed the mails for 90 days, more or less, because that act called for weighings for “ not less than 30 successive working days.” When, therefore, we find a direction in the later act that they shall be weighed hereafter for not less 'than 90 successive working days, it must be concluded that Congress had a purpose in making the change. If satisfied with the results under the prior law, why enact the later one? If the exception be to the use of the word “method” in that connection it may be conceded that it was not essential to the thought conveyed. It was in effect, if not in words, held that the act of 1905 was not a legislative adoption of the prevailing method for ascertaining the daily average weight and if Congress did not have that method in mind it would seem that the act had no bearing on the ques *296 tion of a fixed divisor one' way or the other, since there is nothing in its language to show that they had. Our view of the meaning of the act of 1905 is that it did not affect the powers of the Postmaster General in any regard, whether such powers were statutory or discretionary, mandatory or directory, except to require weighings for not less than 90 successive working days. We might upon that point accept the statement found on different briefs as follows: “This act changed neither the rates nor the basis of pay, but contains the same provision with reference to said basis as that embodied in the act of 1873 ”; or
That the act “means the same thing in every particular that the act of 1873 meant, whatever that was ”; or
That “it lengthened the period for demonstration by weighing but made no change in the elements to be considered nor in the manner of their use or combination ”; or
“ This act of 1905 did nothing more than make the weighing period include 90 instead of 30 working days.”
If, on the other hand, its purpose was to require “ a longer period of weighing by which to get, as was supposed, a fairer average of weights,” it certainly authorized the official charged with that duty to adopt a method which would accomplish the desired result. The fact that when the act was upon its passage in the House the chairman of the committee changed the language of the bill as reported so that “ there could be no question of the construction that can be made of the law ” merely confirms the view that the act was not intended to change the law except as to the number of weighings. In fairness it should be stated that plaintiffs did not by the expressions quoted intend to concede our interpretation of the act of 1873, but they can not "find in its terms a positive mandate to pursue the course adopted by the department, and they must have recourse to what is termed the long-continued departmental construction or legislative adoption thereof. Their contention leads to the conclusion that the Postmaster General gave an authoritative and final construction of the statute. This, we think, is beyond his power. The statute does not confer the power of legislation, nor can the exercise of the power have the *297 effect of legislation. United Verde Copper Co., 196 U. S., 207, 215. Every statute, to some extent, requires construction by the public officer whose duties may be defined therein. He must read the law and must, therefore, in a certain sense construe it in order to form a judgment from its language what duty he is directed to perform. Roberts’ case, 176 U. S., 221, 231. There is, however, a distinction between acts involving the exercise of judgment or discretion and those which are purely ministerial. With respect to the former the courts are without power to control executive discretion, but with respect to ministerial duties an act oí refusal to’act is or may become the subject of review by the courts. Noble v. Union River Logging Co., 147 U. S., 165, 171. We think the course pursued was a matter of usage or practice rather than of construction and finds its support-in whatever discretion the act of 1873 vested the Postmaster General with, taken in connection with other provisions of law, supplemented by the act of 1875 authorizing such instruction as the Postmaster General deemed proper. It appears that in “ a documentary history of the railway history from its origin, in 1834,” which was transmitted to Congress in 1885 by the Postmaster General, it was stated that while there had been some little controversy at one time “ as to the justness of the present method ” of obtaining the daily average weights a little examination would show that “no other way of proceeding could be so just as that now in vogue.” Thus it was because he and his predecessors thought that the method was just to the railroads and the Government that he adopted the usage. Proceeding to state that method it is explained in the history that on the 6-day routes the sum of 30 weighings are divided by 30 and “ give the daily average,” while on the 7-day routes the “weighing is done for 35 succesive' days (including Sundays) and the aggregate divided by 30 for a basis of fay.” Why a succeeding Postmaster General could not with equal right adopt a method of finding an actual average on 7-day routes and dividing the aggregate of 90 days weighings on 6-day routes for a basis of pay is not made entirely clear, when it be assumed that in his wise discretion he decided that the new *298 method was just to the department and the railroad companies and had a proper regard for the purposes of the law.
In the hearing before a congressional joint committee in 1914 it is shown that in 1873 there were 684 six-day routes and only 97 seven-day routes. The aggregate mileage of the first class was then approximately 48,000 miles and of the latter 15,000 miles. The annual pay to the six-day routes was approximately four and three-quarter millions and to the seven-day routes it was approximately two and a half millions of dollars. Charged with the duty mentioned the Postmaster General found the daily average weights, as has been stated, and his action was followed until 1907. When he came to consider the situation in 1907, he found, instead of 684 six-day routes as in 1873, that they had increased to about 1,394 in number, with an aggregate mileage of about 49,000 miles, while the seven-day routes had increased in number from 97 in 1873 to about 1,600 in 1907, with an aggregate mileage of 153,000 miles. While, therefore, the six-day routes about doubled in number in the 34 years the seven-day routes had increased by about 16 times their number during the same period.
From receiving somewhat more than a third of the whole compensation paid for mail transportation by railroads in 1873 to both classes, the seven-day routes were being paid in 1907 about thirteen times as much as the aggregate of the sixrday routes. That is, the six-day routes were being paid approximately three and a quarter millions of dollars per annum in 1907, and the seven-day routes were receiving over forty-one millions of dollars.
Assuming that the weights carried bore some proper relation to the pay received it would thus appear that the seven-day routes (which carried so much smaller aggregate weight in 1873 than six-day routes) were transporting in 1907 many times more weight than the six-day routes were transporting.
The relative positions of the two classes, had changed in 1907, as has been shown. The greater mileage and the greater weights appeared on the seven-day routes.
When the Postmaster General laid out his course in 1873, he adopted as a basis for the actual average the six-day *299 routes, they being the more in number and carrying the greater weights. He or some of his immediate successors adopted the same divisor for the seven-day routes “ as a basis for pay.”
If by the act of 1905 there was to be a longer period of weighing by which to get, as was supposed, a fairer average of weights, and only one divisor was to be used, it can not be reasonably affirmed that a fairer average is not attained when, considering all the routes, the basis is laid upon the class which is greatest in number and handles the larger weights.
We are told in one of the briefs that the readjustments of compensation were made upon the basis of “ six round trips per week,” and it is hence stated that “ Sunday service never was and is not now within the contract and could be discontinued at any time without a reduction of compensation.”
If such be the case, does it tend to support the claim that they be credited each day with an increased average? The theory was that as the seven-day routes carried mail more frequently than others, their daily average should not be actual, and it was increased by the method used. If they voluntarily transported the mails on Sunday, they can not recover for the service; and if they do not contract to do so, why may not the Postmaster General, under such instructions as he may consider just to the parties and within the terms of the law, find the actual average and accordingly agree to pay for what the carrier does contract to carry?
We do not mean to imply that the provision as to six round trips per week means what plaintiffs suggest. The postal laws and regulations provide for deductions for failure to perform trips, and it is probable that the failure to transport the mails as agreed is visited with fines and deductions. The act of 1906 requires as much.
But the contention is that the divisor became fixed by the passage of the act of 1905 because, it is urged, “that the enactment by Congress without change of a statute which had previously received long continued executive construction is an adoption by Congress of such construction.”
*300 The rule stated is found in the Hermanos case, 209 U. S., 337, 339, is rested upon the Falk case, 204 U. S., 143, and is repeated in the Komada case, 215 U. S., 329, 396. These cases are mentioned in the Chicago & Alton case. In referring to the Hermanos case it was said that the opinion stated that the contention of the Government that the paragraph under consideration separated distilled wines in bottles into three classes and fixed a specific rate of duty on each and that (1) the court thought the contention was right and needed no comment to make it clear; further, that counsel for the Government “ also pointed out ” that the tariff act of 1875 and subsequent acts were substantially similar to the paragraph under consideration and that Treasury decisions were in accordance with the interpretation for which the Government contended, and, therefore, it was said, (2) “ We have stated that when the meaning of a statute is doubtful great weight should be given to the construction placed upon it by the department charged with its execution,” citing Robertson v. Downey, 127 U. S. 607, and another case, and (3) the rule above quoted is then stated. It was to this third proposition, in its nature distinct from the other two mentioned, that the Falk case is cited. Two of the justices concur “ solely because of the prior administrative construction,” from which we infer that they did not agree that the first contention of the Government was right and needed no comment to make it clear and hence concurred solely upon another ground, the statement relative to which was in the second proposition, above stated. We repeat these observations not because they are essential to the conclusion we reach but as tracting the history of the rule.
The decisions of the Supreme Court are controlling in this court and their statement that a rule had been announced is authoritative. It is not for us to question the accuracy of their statement, but when called upon to apply a stated rule we must consider the facts of the case to which the rule is sought to be applied, and we may refer to the conditions under which the rule was announced, because the rule is applicable where similar conditions present themselves. In the cases mentioned the court was considering tariff legisla *301 tion; and, as is well known, the proper application of tariff provisions frequently calls for construction of the law under which those charged with its execution may proceed and the rights of importers become fixed. Their construction does not involve a discretion to do one or another thing, but does involve a positive duty to execute the law. Men direct their business and import their goods in reliance upon an adopted construction. Provision is made for hearings in tariff matters, where an interpretation of the act may be had, and the Treasury decisions are reported. It may be that the statement of the rule is not to be limited by the character of the cases in which it was announced, but we do not think it was meant that in all cases where a statute uncertain in terms is reenacted without change the court must ascertain from the department charged with its execution the construction which that department put upon the prior act. The court is not absolutely bound to give, but may give, the departmental construction a controlling effect. Chicago & Alton case, p. 492. And where a given rule is invoked we may have regard to the reason for it, because, generally speaking, the reason ceasing, the rule itself need not be applied.
We do not think it necessary, however, in these cases to even attempt to qualify the rule stated. In an applicable case we would not feel authorized to do so. The rule does not apply here, because we are concerned with what is called a construction, but which is, we think, a usage that had its origin in the duty of exercising judgment and discretion and not in interpretation of doubtful terms under which rights would vest, or which, if changed, would defeat or injuriously affect those rights. If when authorized to adopt a course which to him seemed just to the Government and the railroads, the Postmaster General could pursue the one or the other method of ascertaining the contemplated average then manifestly the method adopted by one could be altered by another so long as the change was made prospective, because being charged with all the duties imposed by law the succeeding Postmasters General were vested with all the powers conferred by law.
*302 The claims of the plaintiffs arose after the issuance of Order 412, and no retrospective effect was given to that order. The right to give instructions as to the weighing was as absolute in 1907 as in 1873.
With the wisdom of the change, so long as the right to make it remained, the court has nothing to do. Wright's case, 11 Wall., 648.
It may be remarked that the expression in the cases of an unwillingness by the court to depart from a long-continued departmental construction of an uncertain or ambiguous act is referable to the court’s action when called upon to construe the law, and they do not in general refer to the right of a department itself to change its construction while giving it a prospective operation.
(d) That proceedings had in Congress at or before the passage of the act of 1907 were a legislative adoption of the divisor of 30 or a recognition of it as a requirement of law.
The act of 1907 did not affect the method of ascertaining the daily average weight. It reduces the rates, and it may be observed that while legislation has touched in rare instances since 1873 the question of compensation, it has uniformly been in the direction of reducing it, exqept in a limited way as the act of 1907 may affect land-grant roads. Only once since 1873 has legislation referred in terms to the ascertaining of average weights, that being the act of 1905. It may be conceded that by the literalism of the act of 1907 the Congress fixed the rates thereafter to be paid on certain routes, and thus for the first time made a rate that was other than a maximum rate. But in doing that no change was made in the right, power, or duty of the Postmaster General to ascertain the average weights under the permissive features of the law.
As bearing upon the effect of the act of 1907 and upon the method of ascertaining the average weights then in vogue, it is earnestly urged that certain proceedings in Congress as well as the act of 1907 itself, evidence a purpose <?n the part of Congress to make permanent the divisor then being used, and that such effect must be given to said act and proceedings.
*303 It is plain that the act does not in terms say what the divisor shall be. The House committee’s bill, as reported, provided a method for ascertaining the daily average weight “ by the actual weighing of the mails for such number of successive days, not less than one hundred and five.” Accompanying the bill was a report explaining the prevailing construction and practice and that the purpose of the said provision was to change the method of ascertaining the daily average weight. This provision in the bill was confessedly subject to a point of order under the rules of the House, and it was accordingly so ruled later. The two amendments offered by a Member were ruled out of order by the chairman and his ruling was sustained upon appeal. These proceedings were being had in Committee of the Whole House on the state of the Union. The vote that was taken was upon the correctness of the chairman’s ruling, and not upon the merits of the proposed amendments. Placing his ruling upon one of the grounds stated by him that an amendment which will have the effect of changing the discretion vested in an executive officer by law is a change in existing law, the ruling would seem to be correct if we may have recourse to the precedents wherein it is held that an amendment to an appropriation bill having that effect is subject to a point of order. (Hinds' Precedents, vol. 4, pp. 569, 570, secs. 3848 et seq.) It may be questioned whether proceedings thus had in Committee of the Whole House on the state of the Union amount to legislation. They can not be accepted as showing the meaning of an act that was adopted containing no reference to the method of ascertaining the average weight. These proceedings were had two years after the act of 1905, where some reference is made to average weights. That the amendments proposed, and for that matter the committee’s amendment, would have made definite and mandatory a method of finding the average weight and would have removed any permissive or directory feature in the law or any discretion of the Postmaster General in its application is plain.
Assuming that the statutes under which he acted had authorized the Postmaster General in his discretion to adopt *304 one or another method, the use of the divisor 30 was not mandatory upon his successors, and since Congress has not changed the law, that power continues. We can not say that the refusal of the House, if it were so, to make permanent law on the subject was in fact or effect a making of the divisor fixed and absolute. They can not be said to have included an element which they excluded. Since they refused to adopt the proposed amendments which would have removed the discretion and would have made a fixed divisor of 105, we can not say that they removed all discretion and made a divisor of 90 when the legislation omits any reference to either. Nor is the situation altered by reference 4# other proceedings in the House and Senate.
The courts have consulted legislative proceedings to learn the history of the period, and it is said in the Tap Line cases, 234 U. S., 1, 27, that the debates may be resorted to for the purpose of ascertaining the situation which prompted the legislation.
In St. Louis & Iron Mountain Railway Co. v. Craft, 237 U. S., 648, Mr. Justice Van Devanter in delivering the opinion, interpreted the law in question according to its terms and then made “ a brief reference to the peculiar circumstances in which the new section was adopted,” to show that they gave material support to the conclusion to which the court came after considering the terms of the act. After stating the reports of the Judiciary Committees of the two Houses, he adds (p. 661) that while these reports can not be taken as giving to the new section a meaning not fairly within its words, they persuasively show that it should not be narrowly or restrictively interpreted. The act was not silent upon the question involved, and its terms were construed, and this not by what the proceedings showed but by what was “ fairly within its words.”
Similarly, in Delaware & Hudson Company case, 213 U. S., 366, reference is made to certain legislative proceedings, but the court declined to extend the meaning of the statute beyond its legal sense because of a supposed intention not manifested in its terms, and it was said by the Chief Justice that if the mind of Congress was fixed upon a stated *305 proposition, “then we think its failure to provide such a contingency in express language gives rise to the implication that it was not the purpose to include it.” This court, in Atchison, Topeka & Santa Fe R. R. case, 52 C. Cls., 388, referred to proceedings in Congress for the purpose of ascertaining subject matter of legislation, to which the mind of Congress was addressed, and to which they gave expression. We can not think that the refusal of one or both Houses to legislate upon a given subject amounts to making mandatory a law which was permissive, or to the withdrawal of a discretion with which an executive officer was charged.
The other cases cited on the briefs are not in conflict with our view.
We hold, therefore, that the Postmaster General had the same authority in 1907 that he had in 1873 and 1875, and thereafter, whether the law contemplated an actual average or a permissive one. Other contentions of plaintiffs are concluded by what has been said.
The case of the land-grant roads depends upon the validity of Order No. 412, and we can not say it was an unlawful exercise of the Postmaster General’s discretion under the law. It may be added that the action is by a plaintiff on parts of whose lines are land-aided sections and that the plaintiff contracted for all classes of its routes.
As to all plaintiffs, being free to contract, the considerations to be stated are controlling. Whether the daily average weight should be ascertained according to the literal terms of the act of 1873 or according to the discretion of the Postmaster General, having regard to the questions left for bim to solve, the result is the same because in either case their rights were fixed by their contracts to transport the mail.
Second and chiefly: The actions are upon contract. Under the views expressed herein, and in the Chicago & Alton and the Yazoo & Mississippi Railroad Company cases, no further discussion of the contention that the statute fixed, the compensation is necessary. There was no statutory contract.
It is contended, however, that there was no express contract, and that recovery should be had upon a supposed im *306 plied oontract, the damages or compensation to be ascertained as upon quantum meruit. While this contention would seem to be a departure from what we think is a proper conclusion from the averments of the petitions, that consideration may be pretermitted.
The general rule is that where one party, at the request of another, does work and labor or performs service for the benefit of such other, the law will imply a promise on the part of the one receiving the benefit to pay the reasonable value of the work and labor done or the service performed where there is no express contract between them fixing the terms upon which the service is to be performed.
“ Indebitatus assumpsit is founded upon what the law terms an implied promise on the part of the defendant to pay what in good conscience he is bound to pay to the plaintiff.' Where the case shows that it is the duty of the defendant to pay, the law imputes to him a promise to fulfill that obligation * * *. But the law never implies a promise to pay unless some duty creates such an obligation, and more especially it never implies a promise to do an act contrary to duty or contrary to law.” Curtis v. Fiedler, 2 Black., 461, 478; United States v. Russell, 13 Wall., 623, 630.
By an express promise a party may agree to pay more than the work and labor done or the service performed is reasonably worth, or he may agree upon a measure for ascertaining the value of the work and labor done or service performed.
It was stated in the Yazoo & Mississippi case that the record did not show a basis upon which the court could properly adjudge what was the reasonable value of the service performed, and plaintiffs urge that the compensation paid for similar service under prior express contracts should be taken as proof of what the service rendered under the implied contract was reasonably worth — that the former course of dealing, in the absence of more definite proof, is sufficient to establish the essential fact. The contention overlooks, however, an important element in the prior express contracts. That element was the authorized exercise by the Postmaster General of discretion in proposing or agreeing to the compensation, and the court can not supplant his discretion by any of its own, because it has no discretion. *307 What he did in the exercise of his discretion and the performance of his duties when considering his course with reference to a given average weight and the terms of a contemplated contract can not be accepted as proof that a service performed after he had exercised his discretion in another way is to be paid for on the basis which he has rejected. The rule could be applied, as has been done, where both parties understood that the service was being performed without any stipulation by both or offer by either of the terms. To apply it in these cases leads to the result that by refusing to accept the Postmaster General’s proposal the carriers can carry the mail, receive regular installments of pay therefor, according to the terms of an offer, and by withholding express assent to a vital term in the offer can impose a contract upon the Government which its agent refused to make. It is well established that a contract can not be imposed upon the carrier. It was not until the act of 1916 that carriers were not free to accept or reject the proposals of the Postmaster General and to refuse to transport the mail.
The carrier’s rights being well defined, its duties to accept the proposed terms or to refuse to transport the mail is apparent. By its refusal the Postmaster General would have been obliged, in the performance of his statutory duty, to have made other arrangements or to have offered more satisfactory terms. The law will not raise up a promise which involves the breach or defeat of a statutory duty.
When proceeding in a proper case to ascertain reasonable compensation as upon quantum, meruit, the pay is commensurate with the service rendered — that payment should be-made for what was done.” Jacksonville, P. & M. R. R. Co., 21 C. Cls., 155, 170; Railroad v. United States, 101 U. S., 543, 549. A right to recover as upon quantum meruit implies that the party should have such payment as he deserves for the services performed.
To be entirely accurate in such a matter the carrier would have to be paid for the weights carried. These can not be known, and the only basis for them is the ascertained average.
*308 As to the seven-day routes, there can be no question that upon the fullest application of the rule they can not recover as upon quantum meruit in face of the acknowledged fact that they have received payment for the average weight of mails actually carried. Their claims are illustrated near the beginning of this opinion.
If it be conceded that because of a lawfully vested discretion the Postmaster General was authorized to contract with railroad companies upon the basis as to seven-day routes of a permissive or • factitious daily average weight, and at the maximum rates prescribed by law, and further that Congress by their repeated appropriation recognized or approved his action in that regard, as they had the right and power to do, it must yet follow that a court is without right to increase either the daily average weight or the rates prescribed by statute, whether they be maximum or fixed rates.
On the other hand, if their case rested alone upon that question, it might be said that the average on the six-day routes could not be decreased. Certainly quantum meruit does not mean that they shall be paid for more average weight than they carried, for more service than was performed, and if the six-day routes are not strictly in that situation, it yet follows that the view next stated is determinative and is applicable alike to both classes of routes.
The mails were transported under express and not under implied contracts.
Upon the receipt of the distance circular the carrier signed the acceptance, in some instances without qualification, in others with an exception noted therein by its officer, protesting an unwillingness to be bound or refusing to be bound by Order 412. It may be conceded that as to those so objecting there was up to that time no meeting of the minds, and consequently no contract between the parties. Standing alone, “plainly no contract between the parties resulted from the correspondence so far had between them.” It is equally true that if the acceptance clause had been signed without exception a carrier could not have sued the Government as for a breach of contract if the mails had not been subsequently offered, because it was yet open to the Post *309 master General to adjust the compensation and propose his terms. He was still charged by the statute with the duty of contracting within the maximum rates or for such compensation as he regarded as just and reasonable. But more occurred. The Postmaster General informed the protesting carriers that they could only carry the mails in accordance with the rules, regulations, and laws, and thereafter when he sent to the several plaintiffs the result of his computation, it stated the terms of his proposal. It was not a four-year contract, but was a readjustment of compensation, “unless otherwise ordered,” which had the effect of limiting the duration of the contract. Eastern R. R. case, 129 U. S., 391; Delaware & Lackawanna R. R., 51 C. Cls., 426. It also stated that the carrier was subject to fines and deductions and to the rules and regulations of the department, and Order 412 was one of these.
A carrier which had qualified its acceptance of the distance circular was not bound to accept the proffered terms. A contract could not be imposed upon the carrier (cases supra), nor could it compel the letting to itself of a contract for mail transportation. As is stated in one of the briefs, “ it was for the Postmaster General, acting upon his own appreciation of the extent of his lawful power, to propose terms, and for claimant, not compelled by law to perform such service, to accept or reject the terms proposed as it saw fit.” And while this statement was apparently intended to apply to the situation of the parties as they stood when plaintiff had qualified the terms of the acceptance clause, it none the less correctly states the attitude of the parties thereafter until plaintiff had received and transported the mails and had received periodical payments therefor in accordance with the readjustment notice. The carriers accepted these payments without objection of any kind.
In the Eastern Railroad Company case, supra, it was said by this court:
“When the extent of an implied contract or the meaning of the language of a written contract are in controversy, the intention of the parties becomes all important. Their acts at the beginning and during the term of the contract acquiesced in on both sides, the claims and construction set *310 up by one party and not denied by the other, go very far to explain, if they do not actually establish by way of estoppel, the actual contract between them as well as its proper interpretation. (Otis v. United States, 19 C. Cls., 467.) The present claimant having no clear and definite time contract was bound to take notice of the Postmaster General’s offer of future compensation, and its acts at the time amount to an acceptance of his offer.”
This case was affirmed in 129 U. S., 391; and it is there said, p. 396:
“Chief Justice Richardson, speaking for the Court of Claims, properly said that the order for the reduction under the act of 1878, and the notice thereof to the company ‘ constituted an offer on the part of the Postmaster General which the claimant might decline or accept at his pleasure.’ Having received the reduced compensation without protest or objection, it may be justly held to have accepted that offer.”
In the Martin case, supra, the Supreme Court stated two principles, both of which are applicable in these cases: The one that the act was merely directory and did not interfere with the freedom of contract, and the other that as the parties were free to contract, effect was to be given to the action and conduct of the plaintiff in having repeatedly accepted, without protest or objection, payments based upon the contract as the Government understood it to be. Other courts have applied the same principles.
In Coleman’s case, 81 Fed., 824, it is held that even if the construction of the statute therein mentioned is too broad, and the petitioner be entitled to its benefits, he would yet have no right of action in the absence of notice by protest or objection that the payments were not in discharge of the liability.
In Timmonds’ case, 84 Fed., 933, the Circuit Court of Appeals, Seventh Circuit, took the same view, and, referring to Martin's case, p. 934, said:
“ It was there ruled that the provision in question is in the nature of a direction by the Government to its agents, and is not a contract .between the Government and its servants; that it does not specify what sums shall be paid for the labor of eight hours, nor that the price shall be larger when the *311 hours are more, or smaller when the hours are less;” that being in the nature of a direction, the statute does not constitute a contract to pay for the excess time and that the employee “ was under no compulsion, he could have abandoned his service if it proved distasteful or onerous,” just as plaintiffs here could have done if there was no express contract.
In Moses’ case, 126 Fed., 58, the Circuit Court of Appeals, Ninth Circuit, took the same view of the contractual relations between the parties.
In Averill's case, 14 C. Cls., 200, 206, it is held that where the employee continued to work, was paid by the day and accepted the payments, he could not maintain his action based upon the theory that eight hours constituted a day’s work. Gordon’s case, 31 C. Cls., 254.
In McCarthy v. Mayor, 96 N. Y., 1, the court-took the view that the act before them was intended to place the control of the hours of labor within the discretion of the employee rather than of the employer, and yet held that unless there was an express contract providing for extra compensation, it could not be implied.
In Grissell v. Noel Brothers, 36 N. E., 452, the Indiana Appellate Court said that the statute permitted parties to contract, and that if one person employs another to perform work for a stated sum, and at the end of the time pays that sum, and the employee accepts it in payment, he can not afterward recover an additional sum albeit he may have worked for longer hours.
“ The acts and conduct of the parties in the case supposed are such as to raise a conclusive presumption that the amount received by the employee was accepted in full payment of what was due him. The same rule applies where the work is done by the week or month or year.”
It appears in that case, as it does in these, that the plaintiff knew when he entered upon the service the nature and’ amount of work that was required of him, as well as the compensation he was to receive therefor, and it was said that if he was not satisfied at the end of a day or week with wrhat was being paid him, he should have exacted an *312 agreement for more compensation or exercised his right to quit the employment.
“ By continuing in the employer’s service under the terms of the employment, he waived any right to claim additional compensation.”
The principle is illustrated by Vogt. v. City of Milwaukee, 74 N. W., 789, where an employee worked 8 hours daily for the first 30 days, and thereafter, without protest, worked 12 hours a day and received the same pay. A city ordinance had provided that 8 hours should constitute a full day’s work for city employees. The plaintiffs sued for compensation for overtime and contended that the ordinance entered into and became a part of the contract, and that thereby the city became bound to pay the amount specified for each day of 8 hours’ service. A similar contention is made in these cases. The Supreme Court of Wisconsin held otherwise, and said, p. 791:
“ The law which allows contracting parties, through the medium of an express contract, to fix in advance the value of a service to be rendered, also allows them to fix the value in cases of implied contract after the service has been rendered. It may as well be fixed by acts of the parties as by express agreement. Here it seems certainly to have been fixed by acts of the pai'ties, and the plaintiff can not now be permitted to dodge or escape the legal effect of bis conduct.”
It is unnecessary to multiply cases (though some are cited below) to establish the rule that the existence of contractual relations or the acceptance of a proposal can as well be shown by the action and conduct of parties as by their language. What a party does can as well conclude him as what he says he will do. Each time a plaintiff was paid, and received the compensation stated, it “ as effectively notified him that his compensation for the time in service was the rate so specified as if he were formally notified.” Vogt v. Milwaukee, supra, citing Miller's case, 14 C. Cls., 200.
It was held in Baird's case, 96 U. S., 430, where the plaintiff had presented an unliquidated claim to an accounting officer, claiming over $150,000, which they reduced to about $97,000, and then sent him a voucher for the latter amount, *313 which he received without protest or objection, that he was concluded by his action in accepting the payment.
The rule was applied in Garlinger's case, 169 U. S., 316, 322, and was recognized in McMath's case, 51 C. Cls., 356.
Cases supra; Central Pacific Co., 164 U. S., 93, 97; Illinois Central R. R. Co., 18 C. Cls., 118, 132, 136; Jacksonville, Pensacola & Mobile Co., 21 C. Cls., 155, 170, 171; 118 U. S., 626; Minn. & St. Louis Ry. Co., 24 C. Cls., 350, 360; Alabama Great Southern R. R. Co., 25 C. Cls., 30, ibid. 142 U. S., 615; Texas & Pacific Ry. Co., 28 C. Cls. 379, 390; Chicago & Alton Case, 521, 532.
If any effect is ever to be given to a party’s action as determining the existence of a contract, these cases call for its application.
It is admitted that the carriers received and transported the mail after the alleged exception to Order 412; admitted that they received compensation in accordance with the readjustment notice; admitted that this compensation was paid monthly or periodically; admitted that the readjustment of compensation was made for no definite period, but “unless otherwise ordered”; admitted that the readjustment of compensation was subject to fines and deductions; admitted in at least one of the cases at bar, and it may be assumed as to others, that fines and deductions were imposed and retained without objection; admitted or shown that the notice stated that the compensation was based upon not less than six round trips per week; admitted or shown that no objection to the payments was at any time made and that several years intervened before suit, and, these things being true, the action and conduct of the plaintiffs were plainly inconsistent with their present contention.
The distance circular proposed no terms and the readjustment notice did. It was the acceptance and transportation of the mail and the repeated acceptance of the monthly or periodical pay after the Postmaster General had replied to the protests, all without protest or objection, that consummated the contract, the terms of which were evidenced by the notice itself. While the carrier had protested it would not consent, it yet consented. A party will not be heard to *314 deny the natural and reasonable effect of his action as regards his contractual relation or to take a position inconsistent therewith when to do so would involve a breach of official duty by the other contracting agent. The law required the Postmaster General to make contracts for mail transportation, to file copies of them (Rev. Stats., sec. 404), and to enforce fines and deductions under the terms of his contracts with railroad companies (act of June, 1906). It did not lie with the carrier to defeat these requirements by a refusal to accede to one term of the proposal and then pursue a course of action antagonistic to the suggested refusal. It can not compel the leaving of the contractual relation to be implied. It could have refused the terms or it could have accepted. It could not select those that served its purposes and leave to the incertitude of the future the ascertainment of the terms upon which the mail was being transported. In a matter of so great public importance it was its duty to be definite and to speak if it did not intend to be bound. Their action establishes the essential fact. The plaintiffs transported the mails in accordance with the terms proposed by the Postmaster General, and, having been paid the sums respectively due them, it follows that their petitions should be dismissed. And it is so ordered.